Jesse S. Johnson (to seek admission *pro hac vice*)
Florida Bar No. 0069154
GREENWALD DAVIDSON RADBIL PLLC
7601 N. Federal Hwy., Suite A-230
Boca Raton, FL 33487
Telephone: 561-826-5477
jjohnson@gdrlawfirm.com

*Counsel for Plaintiff and the proposed class*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Daniel J. Rodriguez, on behalf of himself and others similarly situated, | ) | Case No. |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CLASS ACTION COMPLAINT AND** |
| vs. | ) | **TRIAL BY JURY DEMAND** |
| | ) | |
| QS Next Chapter LLC f/k/a Express Interlock LLC d/b/a QuickStart Ignition Interlock, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

1

**Nature of the Action**

1.     Daniel J. Rodriguez ("Plaintiff") brings this class action against QS Next Chapter LLC f/k/a Express Interlock LLC d/b/a QuickStart Ignition Interlock ("Defendant") under the Consumer Leasing Act ("CLA"), 15 U.S.C. § 1667, and its implementing regulations, 12 C.F.R. § 1013 *et seq.* ("Regulation M"), on behalf of himself and other similarly situated customers of Defendant's.

2.     Plaintiff alleges that Defendant violated the CLA and Regulation M by providing woefully insufficient financial disclosures in its ignition interlock lease agreements.

3.     By virtue of these insufficient disclosures, Plaintiff and other ignition interlock lessees signed equipment lease agreements with Defendant without understanding their true financial commitments—a concern the CLA specifically aims to prevent.

4.     Indeed, "Congress enacted the CLA as an amendment to the [Truth in Lending Act ("TILA")] and [thereby] extended the TILA's 'credit disclosure requirements to consumer leases.'" *Clement v. Am. Honda Fin. Corp.*, 145 F. Supp. 2d 206, 209 (D. Conn. 2001).[1]

5.     TILA—and, thus by extension, the CLA—was put in place to protect consumers from obfuscation or misinformation in credit and lease transactions.

---

[1]     Internal citations and quotations are omitted, and emphasis is added, unless otherwise noted.

6.    In other words, Congress recognized and sought to remedy the information imbalance in credit and lease transactions, particularly for many consumers lacking the financial experience and expertise of those companies sitting across the negotiation table.

7.    Defendant's lease agreements with Plaintiff and the putative class members are defective for the same reasons: they fail to give clear and sufficient financial disclosures required by the CLA and Regulation M, in a manner that satisfies the statute and its regulations.

**Jurisdiction and Venue**

8.    This Court has subject matter jurisdiction under 15 U.S.C. § 1667d(c) and 28 U.S.C. § 1331.

9.    Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b), as the events giving rise to Plaintiff's action occurred in this district, and as Defendant maintains its principal office in this district.

**Parties**

10.    Plaintiff is a natural person who, at all relevant times, resided in Maricopa County, Arizona.

11.    Plaintiff is a "lessee" as defined under the CLA, 15 U.S.C. § 1667(2).

12.    Defendant is a limited liability company registered in Maricopa County, Arizona.

13.    Defendant previously operated under the name "Express Interlock LLC" until changing its name to "QS Next Chapter LLC" in December 2019, according to public records filed with the Arizona Corporation Commission.

14.     According to its Amended and Restated Articles of Organization, Defendant maintains principal offices in Scottsdale, Arizona.

15.     Defendant operates through the trade name QuickStart Ignition Interlock ("QuickStart").

16.     According to public records filed with the Arizona Secretary of State, Express Interlock LLC—Defendant's former name—registered the QuickStart trade name in October 2016, and that registration does not expire until October 2021.

17.     Public records with the Arizona Secretary of State indicate a QuickStart mailing address of 318 S. River Drive in Tempe, Arizona.

18.     This address corresponds with the Tempe location listed on QuickStart's website—one of 10 in all.[2]

19.     Through its QuickStart name, Defendant "is certified, licensed and bonded with the **Arizona** Department of Transportation (Motor Vehicle Department) as an **Ignition Interlock Device** provider" (emphasis in original).[3]

20.     Defendant advertises its product as "The Best Ignition Interlock in Arizona," which is "Affordable, Easy to Use, & ADOT CERTIFIED."[4]

21.     Defendant encourages its customers: "Do your home work [*sic*] & make an informed decision."[5]

---

[2]     https://www.quickstartaz.com/locations/tempe-location/ (last visited May 8, 2020).

[3]     https://www.quickstartaz.com/about-us/ (last visited May 8, 2020).

[4]     https://www.quickstartaz.com/ (last visited May 8, 2020).

4

22.    Defendant leases its ignition interlock devices to drivers throughout the state of Arizona through use of "consumer leases" as defined under the CLA, 15 U.S.C. § 1667(1).

23.    Thus, Defendant is a "lessor" as defined by 15 U.S.C. § 1667(3).

24.    Defendant so identified itself as a lessor in the materials Plaintiff signed.

### Background of the CLA

25.    The CLA at its core requires disclosure of important lease terms—particularly financial terms—to protect consumers entering into lease agreements.

26.    "Passed by Congress as an amendment to the Truth In Lending Act [], the CLA purports 'to assure a meaningful disclosure' of personal property lease terms to 'enable the lessee to compare more readily the various lease terms available to him [and] limit balloon payments in consumer leasing.'" *Gaydos v. Huntington Nat. Bank*, 941 F. Supp. 669, 672 (N.D. Ohio 1996) (quoting 15 U.S.C. § 1601(b)).

27.    In other words,

> [b]ecause lease financing had become recognized as an alternative to credit financing and installment sales contracts, Congress also intended CLA disclosure requirements to enable comparison of lease terms with credit terms where appropriate. The CLA thus requires lessors of personal property subject to its provisions to make specified disclosures when a lease is entered into.

*Turner v. Gen. Motors Acceptance Corp.*, 180 F.3d 451, 454 (2d Cir. 1999).

28.    Accordingly, TILA's "strict liability standard attaches to violations of CLA disclosure requirements as well." *Gaydos*, 941 F. Supp. at 672.

---

[5]    https://www.quickstartaz.com/ (last visited May 8, 2020).

29.    Also important, "TILA reflects a transition in congressional policy from a philosophy of 'Let the buyer beware' to one of 'Let the seller disclose.'" *Layell v. Home Loan & Inv. Bank, F.S.B.*, 244 B.R. 345, 350 (E.D. Va. 1999).

30.    And given the CLA's enactment within the same TILA statutory structure, this philosophy applies with equal force to the CLA and Regulation M.

**Lease Disclosure Requirements**

31.    To that end, the CLA and Regulation M require several types of disclosures in a consumer lease, all of which must be made in a clear and conspicuous manner.

32.    Certain of these disclosures also must be made in a "segregated" manner, separate and apart from the other lease terms:

> The following disclosures shall be segregated from other information and shall contain only directly related information: §§ 1013.4(b) through (f), (g)(2), (h)(3), (i)(1), (j), and (m)(1). The headings, content, and format for the disclosures referred to in this paragraph (a)(2) shall be provided in a manner substantially similar to the applicable model form in appendix A of this part.

12 C.F.R. pt. 1013.3(a)(2).

33.    Those disclosures that must be "segregated from other information" include:

- The amount due at lease signing or delivery;

- The number, amount, and due dates or periods of payments scheduled under the lease, and the total amount of the periodic payments;

- The total amount of other charges payable to the lessor, itemized by type and amount, that are not included in the periodic payments;

- The total of payments, with a description such as "the amount you will have paid by the end of the lease";

- A statement regarding whether the lessee has the option to purchase the leased property, and, if at the end of the lease term, the purchase price; and

- A statement that the lessee should refer to the remainder of the lease documents for additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, insurance, and any security interests, if applicable.

12 C.F.R. pt. 1013.4.

34.    And per 12 C.F.R. pts. 1013.3 and 1013.4, these segregated disclosures must "be provided in a manner substantially similar to the applicable model form in appendix A" of Regulation M.

35.    In other words, if a lessor chooses *not* to use the model form attached to the implementing regulations (and attached here as Exhibit A), the requisite "segregated" disclosures must be given in a manner at least "substantially similar to" to that model form.

36.    These requirements for "segregated" disclosures date back to 1996, when the Board of Governors of the Federal Reserve System ("Board") conducted a review of Regulation M to ensure its continued and adequate protection of consumers.[6]

37.    Among the Board's observations in 1996: "The major revision to this section [of Regulation M] . . . is the requirement to segregate certain disclosures from other information. Clear and conspicuous lease disclosures must be given prior to

---

[6]    The Board remained tasked with oversight of the CLA and Regulation M until the creation of the Consumer Financial Protection Bureau ("CFPB") in 2011, at which time the CFPB assumed the Board's role with respect to such oversight.

7

consummation of a lease on a dated written statement that identifies the lessor and lessee." 61 FR 52246-01, 52249 (Oct. 7, 1996).

38.    The Board amended paragraph 3(a)(1) of Regulation M [12 C.F.R. pt. 1013.3(a)(1)] as follows:

> Former §§ 213.4(a)(1) and 4(a)(2) required that all disclosures be made together on a separate statement or in the lease contract "above the place for the lessee's signature." The Board has deleted this requirement along with the meaningful sequence, same-page, and type-size disclosure requirements, replacing them with the requirement that disclosures be segregated. Most commenters generally supported the proposed segregation requirement, although some commenters opposed the deletion of the other requirements. They believed that the signature requirement ensured that lessors would give disclosures before the consumer becomes obligated on the lease and discouraged lessors from putting important information on the back of a lease document. The Board believes that a segregation requirement and the clear and conspicuous standard provide the same level of protection as the previous rules.

> The segregated disclosures and other CLA disclosures must be given to a consumer at the same time. Lessors must continue to ensure that the disclosures are given to lessees before the lessee becomes obligated on the lease transaction. For example, by placing disclosures that are included in the lease documents above the lessee's signature, or by including instructions alerting a lessee to read the disclosures prior to signing the lease.

> Nonsegregated disclosures need not all be on the same page, but should be presented in a way that does not obscure the relationship of the terms to each other.

*Id.*

39.    The Board also amended paragraph 3(a)(2) [12 C.F.R. pt. 1013.3(a)(2)] as follows:

> Most commenters—representing both the industry and consumer groups— generally supported some form of segregation of leasing disclosures. **Many commenters believed that consumers would be more likely to read and**

**understand the disclosures if key items were segregated from other disclosures and contract terms.** Pursuant to its authority under section 105(a) of the TILA, **the Board has adopted the requirement that certain consumer leasing disclosures be segregated from other required disclosures and from general contract terms to assure clear, conspicuous, and meaningful disclosure of lease terms.**

Some commenters, including trade groups that represent a large portion of the motor vehicle leasing industry, suggested that the more important disclosures be further highlighted in a manner similar to the Board's Regulation Z. **The Board believes that the segregation requirement and the requirement that disclosures be in a form substantially similar to the applicable model form in appendix A adequately focuses the consumer's attention on key information.**

Lessors may provide the segregated disclosures on a separate document or may include them in their lease contracts, apart from other information. The general content, format, and headings for these disclosures should be substantially similar to those contained in the model forms in appendix A. Lessors may continue to provide the remaining disclosures required by Regulation M and the CLA in a nonsegregated format.

The model forms in Appendix A for open-end leases, closed-end leases, and furniture leases have been revised.

*Id.*

### Factual Allegations

40.    On or about September 4, 2019, Defendant installed one of its ignition interlock devices in Plaintiff's car, and Plaintiff signed several items in connection with this transaction.

41.    These items include (1) an Ignition Interlock Proof of Installation; (2) a QuickStart Ignition Interlock Installation Verification; (3) a Service Invoice for the installation; (4) a Program Service Agreement; (5) a Tier II Addendum to Lease Agreement; and (6) a Fee Schedule.

42.     Defendant provided Plaintiff two more items at the time of installation, one labeled "Terms and Conditions" and another titled "Installation Certificate," but did not require Plaintiff to sign either of them.

43.     Copies of these documents, eight in all, are attached as composite Exhibit B (the "Agreement").

44.     Plaintiff leased the ignition interlock equipment from Defendant for personal, family or household purposes—namely, for use in his personal vehicle.

45.     The lease term began on September 4, 2019 and was to continue until August 27, 2020, for a total of nearly 12 months, "subject to adjustment to correspond with the order of the applicable governmental authority . . . ." Ex. B at 7.

46.     Due to such an adjustment, Plaintiff had the equipment removed from his vehicle after approximately six months, in February 2020.

47.     Defendant's "Program Service Agreement," which Plaintiff signed, states:

> The Client [*i.e.*, Plaintiff] agrees to abide by all of the provisions of this Agreement, including the obligation to pay all fees, charges, and expenses that are the responsibility of the Client under this Agreement. The Client acknowledges receipt of a copy of the Service Provider's Fee Schedule and the Terms and Conditions identified above and acknowledges that such Fee Schedule and Terms and Conditions are subject to change, except where limited or prohibited by law.

*Id.*

48.     In turn, the "Terms and Conditions"—referenced in the Program Service Agreement—requires that Plaintiff "pay the Service Provider [*i.e.*, Defendant] for all

fees, charges, and other amounts arising under the Agreement, including those fees and charges detailed in the Fee Schedule." *Id.* at 8.

49.    Such "[f]ees and charges payable include but are not limited to" installation charges, monitor fees, miscellaneous service charges, loss protection plan charges, early contract termination fees, appearance fees, taxes, and enforcement costs. *Id.* at 8-9.

50.    Turning to the "Fee Schedule"—referenced in the Program Service Agreement as well as in the Terms and Conditions, and which Plaintiff separately signed—Defendant lists 20 separate line items for different fees and charges. *Id.* at 5.

51.    These line items fall under 7 different categories: Monitoring; Violations/Penalties; Procedures; Service/Service Calls; Unit Loss; Credit Card/Debit Card; and Arizona Department of Transportation. *Id.*

52.    Some of these items are listed as variable rates (*e.g.*, daily, hourly, or per mile) while others appear to be flat charges.

53.    Notable examples include:

- Monitoring QT-2 Daily Rate of $2.9333

- Program violation fee/reset of $40.0000

- Lock-out Override Code fee of $25.0000

- Early Contract Termination fee of $175.0000

- De-Install Fee 6-month deferment of $95.0000

- Vehicle Swap fee of $125.0000

- Service/Service Call hourly rate of $60.0000

- Service/Service Call Mileage rate of $0.5400/mile

54. Finally, Defendant's "Tier II Addendum to Lease Agreement," which Plaintiff separately signed as well, includes provisions for a "Loss Protection Plan," a "Damage Warranty," and "Tier II Fees." *Id.* at 3-4.

55. Each of these provisions carries separate fees, costs, or deductibles.

56. In the "Tier II Fees" paragraph, Defendant mandates:

> In addition to any other fees required under the Lease, Lessee [*i.e.*, Plaintiff] shall pay to Lessor [*i.e.*, Defendant] a monthly fee of $88.00 under this Tier II Addendum. Such fees are non-refundable and cannot be canceled by the Lessee during the term of the Lease. The Tier II fees must be prepaid monthly will payments due under the Lease.

*Id.* at 4.

57. During the lease term, Plaintiff paid Defendant several hundred dollars in total for use of the ignition interlock device subject to the Agreement.

58. When Defendant removed Plaintiff's equipment in February 2020, he paid Defendant an additional fee for that removal.

**Class Allegations**

59. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of a class defined as:

> All persons (1) with an address in Arizona (1) to whom QS Next Chapter LLC f/k/a Express Interlock LLC d/b/a QuickStart Ignition Interlock leased an ignition interlock device for personal, family, or household purposes, (2) with an initial lease term greater than four months, (3) for which the lease is currently in force or was terminated on or after May 8, 2019, and (4) and in connection with which QS Next Chapter LLC f/k/a Express Interlock LLC d/b/a QuickStart Ignition Interlock failed to provide, prior to the consummation of the lease, segregated written disclosures informing the lessee of (a) the amount due at lease signing or delivery; (b) the payment

12

schedule and total amount of periodic payments; (c) the total amount of other charges payable to QS Next Chapter LLC f/k/a Express Interlock LLC d/b/a QuickStart Ignition Interlock, itemized by type and amount, which are not included in the periodic payments; (d) the total of payments owed under the lease; (e) a statement of whether or not the lessee has the option to purchase the leased property, and, if at the end of the lease term, the applicable purchase price; or (f) a statement referencing other requisite, non-segregated disclosures.

60.    Excluded from the class is Defendant, its officers and directors, and any entity in which Defendant has or had a controlling interest.

61.    The proposed class satisfies Rule 23(a)(1) because, upon information and belief, it is so numerous that joinder of all members is impracticable.

62.    The exact number of class members is unknown to Plaintiff at this time and can only be determined through appropriate discovery.

63.    The proposed class is ascertainable because it is defined by reference to objective criteria.

64.    In addition, the proposed class is identifiable in that, upon information and belief, the names and addresses of all members of the proposed class can be identified in business records maintained by Defendant.

65.    The proposed class satisfies Rules 23(a)(2) and (3) because Plaintiff's claims are typical of the claims of the members of the class.

66.    To be sure, Plaintiff's claims and those of the members of the class originate from the same standardized lease documentation utilized by Defendant, and Plaintiff possesses the same interests and has suffered the same injuries as each member of the proposed class.

67. Plaintiff satisfies Rule 23(a)(4) because he will fairly and adequately protect the interests of the members of the class and has retained counsel experienced and competent in class action litigation.

68. Plaintiff has no interests that are contrary to or irrevocably in conflict with the members of the class that he seeks to represent.

69. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since, upon information and belief, joinder of all members is impracticable.

70. Furthermore, as the damages suffered by individual members of the class may be relatively small, the expense and burden of individual litigation make it impracticable for the members of the class to individually redress the wrongs done to them.

71. There will be no extraordinary difficulty in the management of this action as a class action.

72. Issues of law and fact common to the members of the class predominate over any questions that may affect only individual members, in that Defendant has acted on grounds generally applicable to the class.

73. Among the issues of law and fact common to the class:

　　a. Defendant's violations of the CLA as alleged herein;

　　b. Defendant's use of form Program Service Agreements, Fee Schedules, Terms and Conditions, and Tier II Addenda to Lease Agreements;

14

c. Defendant's practice of providing these lease documents without segregated disclosures as required by the CLA;

d. the availability of statutory penalties; and

e. the availability of attorneys' fees and costs.

**Count I: Violations of 15 U.S.C. § 1667a and 12 C.F.R. pt. 1013.4**

74. Plaintiff repeats and re-alleges the factual allegations contained in paragraphs 1 through 73.

75. At 15 U.S.C. § 1667a, the CLA requires in pertinent part that "[e]ach lessor shall give a lessee prior to the consummation of the lease a dated written statement on which the lessor and lessee are identified setting out accurately and in a clear and conspicuous manner the following information with respect to that lease, as applicable:"

(1)    A brief description or identification of the leased property;

(2)    The amount of any payment by the lessee required at the inception of the lease;

(3)    The amount paid or payable by the lessee for official fees, registration, certificate of title, or license fees or taxes;

(4)    The amount of other charges payable by the lessee not included in the periodic payments, a description of the charges and that the lessee shall be liable for the differential, if any, between the anticipated fair market value of the leased property and its appraised actual value at the termination of the lease, if the lessee has such liability;

* * *

(9)    The number, amount, and due dates or periods of payments under the lease and the total amount of such periodic payments.

15

76.     Regulation M further demands that certain disclosures be made in a "segregated" manner separate and apart from all other information contained in a consumer lease:

> The following disclosures shall be segregated from other information and shall contain only directly related information: §§ 1013.4(b) through (f), (g)(2), (h)(3), (i)(1), (j), and (m)(1). The headings, content, and format for the disclosures referred to in this paragraph (a)(2) shall be provided in a manner substantially similar to the applicable model form in appendix A of this part.

12 C.F.R. pt. 1013.3(a)(2).

77.     Among those disclosures required to be "segregated" in such a manner:

> **(b) Amount due at lease signing or delivery.** The total amount to be paid prior to or at consummation or by delivery, if delivery occurs after consummation, using the term "amount due at lease signing or delivery." The lessor shall itemize each component by type and amount, including any refundable security deposit, advance monthly or other periodic payment, and capitalized cost reduction; and in motor vehicle leases, shall itemize how the amount due will be paid, by type and amount, including any net trade-in allowance, rebates, noncash credits, and cash payments in a format substantially similar to the model forms in appendix A of this part.

> **(c) Payment schedule and total amount of periodic payments.** The number, amount, and due dates or periods of payments scheduled under the lease, and the total amount of the periodic payments.

> **(d) Other charges.** The total amount of other charges payable to the lessor, itemized by type and amount, that are not included in the periodic payments. Such charges include the amount of any liability the lease imposes upon the lessee at the end of the lease term; the potential difference between the residual and realized values referred to in paragraph (k) of this section is excluded.

> **(e) Total of payments.** The total of payments, with a description such as "the amount you will have paid by the end of the lease." This amount is the sum of the amount due at lease signing (less any refundable amounts), the total amount of periodic payments (less any portion of the periodic payment paid at lease signing), and other charges under paragraphs (b), (c), and (d) of this section. In an open-end lease, a description such as "you will owe an

16

additional amount if the actual value of the vehicle is less than the residual value" shall accompany the disclosure.

\* \* \*

**(i) Purchase option.** A statement of whether or not the lessee has the option to purchase the leased property, and:

    **(1) End of lease term.** If at the end of the lease term, the purchase price; and

\* \* \*

**(j) Statement referencing nonsegregated disclosures.** A statement that the lessee should refer to the lease documents for additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, insurance, and any security interests, if applicable.

\* \* \*

12 C.F.R. pt. 1013.4.

78.    Here, Defendant violated 15 U.S.C. § 1667a and 12 C.F.R. pt. 1013.4 in several respects by failing to provide such segregated disclosures in the form and manner required by the CLA and Regulation M, prior to the consummation of Plaintiff's lease Agreement.

79.    Specifically, regarding section 1667a(2), nowhere in the Agreement does Defendant properly explain what amount(s) Plaintiff is required to pay at the inception of the lease. *See generally* Ex. B.

80.    To be sure, the Agreement consists of several disparate parts, many requiring their own signatures, and several of which discuss Plaintiff's payment obligations.

81.    But when considered individually and collectively, these several parts forming Plaintiff's lease Agreement nowhere make clear precisely how much Plaintiff immediately owed upon signing the Agreement.

82.    Such information is only clear from a "Service Invoice" showing *after the fact* what Plaintiff paid to Defendant as part of the installation service. *See id.* at 2.

83.    As to section 1667a(3), while the Agreement references payment of taxes, *see id.* at 8, nowhere does it explain precisely what amount(s) of taxes are owed as part of Plaintiff's payments.

84.    In fact, the installation Service Invoice lists taxes of $0.00, indicating taxes are, in fact, *not* owed for Defendant's product and services. *Id.* at 2.

85.    As to section 1667a(4), the Agreement does not adequately explain what "other charges" are payable aside from the $88 monthly payments provided for in the "Tier II Addendum to Lease Agreement," *id.* at 4—which is particularly confusing since the separate Fee Schedule lists several other types of potential charges, including a "QT-2 Daily Rate" for monitoring, an hourly rate for service and service calls, and a mileage rate for service and service calls. *Id.* at 5.

86.    As to section 1667a(9), the Agreement similarly fails to disclose the number, amount, and due dates of Plaintiff's required monthly payments under the lease, as well as the total amount of such monthly payments owed. *See generally* Ex. B.

87.    While the September 4, 2019 Service Invoice shows a next scheduled appointment date of November 22, 2019, *id.* at 2, it does not list how much money will be due to Defendant at that time, nor is there any other specific indication elsewhere in

the Agreement as to when subsequent service appointments will occur, or what fees will be charged at those appointments.

88.    Moreover, while the Tier II Addendum lists "a monthly fee of $88.00," *id.* at 4, it also warns that this fee is "[i]n addition to any other fees required under the Lease"—though such "other fees" are not specified in the addendum, nor made clear anywhere else among the Agreement's several disparate parts.

89.    Turning to Regulation M's requirements for certain disclosures to be "segregated," nowhere in the Agreement does Defendant specifically list an "amount due at lease signing or delivery" or otherwise explain what Plaintiff must pay at lease signing—let alone in a "segregated" manner—in contravention of 12 C.F.R. pt. 1013.4(b). *See generally* Ex. B.

90.    The September 4, 2019 Service Invoice does not save Defendant in this respect, as the Service Invoice is an after-the-fact confirmation of what Plaintiff *already has paid*—not a disclosure of what Plaintiff *will have to pay* if he chooses to sign the Agreement, as is required under the regulations.

91.    Concerning 12 C.F.R. pt. 1013.4(c), Plaintiff's Agreement fails to explain the number, amount, and due dates or periods of payments, nor does it explain the total of periodic payments owed under the Agreement.

92.    Defendant's only attempt in this regard may be found in the Tier II Addendum, which specifies that "[i]n addition to any other fees required under the Lease," Plaintiff "shall pay to [Defendant] a monthly fee of $88.00 under this Tier II Addendum." Ex. B at 4.

93.    But this Addendum fails to tally the total cost of the required monthly payments, specify their due dates, or explain what "other fees" are required "in addition to" the $88.00 listed. *See id.*

94.    In this same vein, concerning 12 C.F.R. pt. 1013.4(d), Plaintiff's Agreement fails to adequately explain what "other charges" will be applied beyond the monthly fee(s), and when.

95.    As to 12 C.F.R. pt. 1013.4(e), nowhere in the Agreement does Defendant disclose "the amount [Plaintiff] will have paid by the end of the lease," or something similar.

96.    More specifically, Defendant never tallies the total amount of money owed under the Agreement—to include initial fees and charges, monthly fees and charges, and other one-time fees and charges required of Plaintiff. *See generally* Ex. B.

97.    As to 12 C.F.R. pt. 1013.4(i), Defendant does not explain in the Agreement whether Plaintiff has the option to purchase his ignition interlock device, and if at the conclusion of the lease, at what price. *See generally* Ex. B.

98.    As to 12 C.F.R. pt. 1013.4(j), Defendant also fails to include in the Agreement a statement referring Plaintiff to the remainder of the lease document for additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, insurance, and any security interests, if applicable. *See generally* Ex. B.

99.    To be sure, such a statement is entirely missing from Plaintiff's Agreement, likely because Defendant made no effort to segregate these necessary disclosures to begin with, as required by law.

100.    Further, to the extent any of the above-listed disclosures may be found scattered among the numerous pages of the Agreement and its several disparate parts, Defendant still failed to meet its burden under the CLA and Regulation M because any such disclosures are *not* properly segregated from other information in the lease, and *not* provided in a manner substantially similar to the applicable model form.

101.    In sum, Defendant's multi-part Agreement with Plaintiff is precisely what the CLA and Regulation M were enacted to avoid—a confusing mess of lease terms that cross-reference one another and thus require the reader to flip pages back and forth in hopes of connecting dots that ultimately cannot be connected.

102.    In short, Defendant's lease materials utterly fail to "focus[] the consumer's attention on key information," as the Board intended.

103.    And Defendant's omissions are significant: at the time Plaintiff signed the Agreement, he was confused and unsure as to many of its terms, including (i) the total amount of money he owed under the lease; (ii) the exact amount of each periodic payment required by the lease; (iii) whether and to what extent other charges may be assessed beyond the monthly payment amounts; and (iv) whether he had the option to purchase the leased property at the conclusion of the lease, and if so, at what price.

104.    Confusion of this magnitude is tantamount to deception on the part of Defendant; at signing, Plaintiff remained oblivious as to the true costs of the lease. *See*

*McQuinn v. Bank of Am., N.A.*, 656 F. App'x 848, 849 (9th Cir. 2016); *Clement v. Am. Honda Fin. Corp.*, 145 F. Supp. 2d 206, 210 (D. Conn. 2001).

105.    By virtue of its violations, Defendant is liable to Plaintiff under 15 U.S.C. § 1667d(a), 15 U.S.C. § 1640(a)(1), and 15 U.S.C. § 1640(a)(2)(A)(i) for all actual damages incurred and for statutory damages in the amount of 25% of the total amount of monthly payments due under the lease agreement.

106.    The harm suffered by Plaintiff is particularized in that the violative lease agreement was presented to him personally, regarded his personal obligations in connection with the lease of ignition interlock equipment, and failed to give him statutorily-mandated disclosures to which he was entitled.

107.    Likewise, the CLA's disclosure provisions

> serve[] to protect a consumer's concrete interest in "avoid[ing] the uninformed use of credit," a core object of the TILA. These procedures afford such protection by requiring a creditor to notify a consumer, at the time he opens a credit account, of how the consumer's own actions can affect his rights with respect to credit transactions. A consumer who is not given notice of *his* obligations is likely not to satisfy them and, thereby, unwittingly to lose the very credit rights that the law affords him. For that reason, a creditor's alleged violation of each notice requirement, by itself, gives rise to a "risk of real harm" to the consumer's concrete interest in the informed use of credit.

*Strubel v. Comenity Bank*, 842 F.3d 181, 190-91 (2d Cir. 2016) (emphasis in original).

108.    No matter, that risk of real harm materialized here, as Plaintiff was unaware of the true costs associated with his lease of the ignition interlock device as a result of Defendant's inadequate disclosures.

109. Had Plaintiff known of the true costs involved, he would have pursued other options to obtain the ignition interlock device he needed.

**WHEREFORE**, Plaintiff respectfully requests relief and judgment as follows:

A. Determining that this action is a proper class action and designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Adjudging that Defendant violated 15 U.S.C. § 1667a and 12 C.F.R. pt. 1013.4 for its failure to provide Plaintiff or members of the proposed class requisite segregated disclosures concerning their leases of Defendant's ignition interlock devices;

C. Awarding Plaintiff and members of the proposed class actual damages pursuant to 15 U.S.C. § 1667d(a) and 15 U.S.C. § 1640(a)(1), and/or statutory damages pursuant to 15 U.S.C. § 1667d(a) and 15 U.S.C. § 1640(a)(2)(B);

D. Awarding Plaintiff and members of the proposed class their reasonable costs and attorneys' fees incurred in this action, including expert fees, pursuant to 15 U.S.C. § 1640(a)(3) and Rule 23 of the Federal Rules of Civil Procedure;

E. Awarding Plaintiff and members of the proposed class any pre-judgment and post-judgment interest as may be allowed under the law; and

F. Awarding other and further relief as the Court may deem just and proper.

### TRIAL BY JURY

Plaintiff is entitled to and hereby demands a trial by jury.

23

Respectfully submitted this 8th day of May, 2020.

By: *s/ Jesse S. Johnson*
Jesse S. Johnson*

* to seek admission *pro hac vice*